**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**NEWPORT NEWS DIVISION**

| | |
|---|---|
| **J.D., by his father and next friend,** ) | |
| **BRIAN DOHERTY,** ) | |
| ) | |
| **Plaintiff,** ) | |
| **v.** ) | **Case No. 4:17-CV-101 (RBS-RJK)** |
| ) | |
| **COLONIAL WILLIAMSBURG** ) | |
| **FOUNDATION,** ) | |
| ) | |
| **Defendant.** ) | |

### DEFENDANT COLONIAL WILLIAMSBURG FOUNDATION'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

**Page**

I.    STATEMENT OF UNDISPUTED FACTS ..................................................... 1

    A.    General Background Information Regarding J.D. and His Health ....................... 1

    B.    The Trip to Colonial Williamsburg........................................................... 5

II.   LEGAL STANDARD ..................................................................................... 12

III.  ARGUMENT ................................................................................................. 13

    A.    As A Matter Of Law J.D. Is Not Disabled, So CWF Had No Duty To
        Accommodate Him ............................................................................. 13

    B.    CWF Did Not Discriminate Against J.D. Because It Offered Him Gluten-
        Free Meals.......................................................................................... 17

    C.    Allowing J.D. And His Father To Dine On Their Own Food Would Have
        Fundamentally Altered The Nature of Shields Tavern's Business..................... 19

IV.   CONCLUSION............................................................................................... 22

Colonial Williamsburg Foundation ("CWF"), by counsel and pursuant to Rule 56 of the Federal Rules of Civil Procedure, hereby moves for summary judgment on Plaintiff's claims that it violated the Rehabilitation Act of 1973, the Americans with Disabilities Act, and the Virginians with Disabilities Act when it offered him gluten-free meals for his alleged gluten-intolerance rather than allow him to bring his own food into Shields Tavern.  As described in more detail below, CWF is entitled to summary judgment because Plaintiff is not disabled within the meaning of the statutes mentioned above, CWF had no duty to accommodate Plaintiff's gluten-intolerance, and if such a duty existed, it satisfied that duty by offering him gluten-free meals.

## I.  STATEMENT OF UNDISPUTED FACTS

### A.  General Background Information Regarding J.D. and His Health

1.    Plaintiff, J.D., is an 11-year-old boy who traveled to Colonial Williamsburg as a fifth grade student on a trip organized by his school, the Naval Academy Primary School ("NAPS") in Annapolis, Maryland.  He was accompanied on this trip by his father, his classmates, teachers and other parent/chaperones.  (Compl. § 1.)  J.D.'s father is in Human Resources for the United States Navy and holds the rank of Commander.  (Deposition of Brian Doherty "Doherty Dep." 49, excerpts collectively attached hereto as Exhibit A.)

2.    The school group travelled by bus from Annapolis, Maryland and arrived in Colonial Williamsburg in time for lunch on May 11, 2017.  (Doherty Dep. Ex. 20, attached hereto as Exhibit B; Deposition of Devon Clouse "Clouse Dep." 39, excerpts collectively attached hereto as Exhibit C.)  As described in more detail below, the school group visited Colonial Williamsburg during the day, dined at Shields Tavern in the evening and then attended other events after dinner. The school group spent the night at a Colonial Williamsburg hotel, continued to Jamestown the following day, and then returned to Annapolis the evening of May 12th.  (Deposition of Mark

Florimonte "Florimonte Dep." Ex. 7, attached hereto as Exhibit D.)

     3.     J.D. was tested for Celiac Disease at a young age.  The test results were negative.  (Doherty Dep. Exs. 7-9, attached hereto as Exhibits E-G respectively.)  Neither J.D.'s mother nor his father have Celiac Disease, but they follow a gluten-free diet.   (Doherty Dep. 44.)  Notwithstanding J.D.'s negative test results, J.D.'s parents put him on a gluten-free diet around the age of 5.  (Doherty Dep. 40.)

     4.     J.D. does not suffer the symptoms commonly associated with gluten ingestion by a person suffering from Celiac Disease.  According to J.D.'s father, J.D. █████████████████ ████████████████████████ (Doherty Dep. 47.)  However, J.D.'s father attributes other symptoms to his gluten-intolerance.  These symptoms include ████████ ████████████████████████████████████████████████ ████████████████████████████████████████████ █████████ (Doherty Dep. 47-48, Ex. 9.)  According to J.D.'s father, the symptoms may take several days to manifest after J.D. ingests gluten.  (Doherty Dep. 89.)

     5.     J.D. also has a condition known as ██████████████████████████.  (Doherty Dep. 31.)  J.D.'s father also attributes this condition to gluten exposure, but J.D.'s mother, in a document she prepared for NAPS, attributes his ██████ to something entirely different.  She wrote that ████████████████████████████████████████████████ ██████████████████████████████ (Doherty Dep. Ex. 3, attached hereto as Exhibit H.)  ████████████████████████████████ ███████████████████████ (Doherty Dep. Ex. 4, attached hereto as Exhibit I.)  ████ ████████████████████████████████████████████████ ████████████████████



(Doherty Dep. 62, Ex. 5 (attached hereto as Exhibit J).)

6.      J.D.'s parents have had him tested for many other conditions besides Celiac

Disease.  ████████████████████████████████████████████████████████

████  (Doherty Dep. Ex. 10, attached hereto as Exhibit K.)  ████████████████████

████████████████████████████  (Doherty Dep. Ex. 6, attached hereto as

Exhibit L.)  ████████████████████████████████████████████████████

████████████  Doctors tested J.D. for this condition, and the tests were negative.  (Doherty

Dep. 35.)  ████████████████████████████████████████████████████████

████████████████████  (Doherty Dep. 36.)  ████████████████  His parents have taken

him to an emergency room multiple times for this.  (Doherty Dep. Ex. 9.)


7.      J.D.'s parents worry that gluten is present in common household items such as soap

and shampoo, and even present in food products expressly certified as gluten-free.  They work

constantly to identify and eliminate other suspected sources of gluten from J.D.'s diet and

environment.  In the six years that J.D. has been on a gluten-free diet, his parents have continually

refined his diet to eliminate additional potential sources of gluten.  (Doherty Dep. 40-41.)

8. ████████████████████████████████████

████████████████████████████████████████████

████████ (Clouse Dep. 32-33.) ███████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

(Clouse Dep. 29-30.)

9.      J.D.'s parents believe that, as a result of their efforts, J.D.'s health is now very good.

According to J.D.'s father:

████████████████████████████

██████████████████████

███████████████████████

███████████████████████████

(Doherty Dep. 45.)

10.      Additionally, J.D.'s gluten intolerance does not limit his life activities in

any significant respect:





(Doherty Dep. 45-46.)

11.     J.D. takes Tae Kwon Do classes.  There are no sports that he wants to play that he cannot because of his health.  (Doherty Dep. 48-49.)

12.     J.D. graduated from NAPS when he completed fifth grade.  His parents are home schooling him now, but not because of health-related concerns.  (Doherty Dep. 10.)

13.     J.D. and his family rarely eat out because of their gluten-free diet.  They had previously frequented restaurants like Chipotle, Red Robin, Maggiano's, Chick-fil-A, and a local frozen yogurt store but no longer do so because they do not trust these establishments to be careful enough to prepare gluten-free meals.  (Doherty Dep. 113, Ex. 13 § 12 (attached hereto as Exhibit M).)  Other than allegedly spotting a single regular noodle in a gluten-free pasta dish at Maggiano's, J.D.'s father could not identify any specific incidents where J.D. was served food containing gluten, but he was troubled by each restaurant's cooking protocols, so they no longer give their patronage to these establishments.  (Doherty Dep. 104-05.)

**B.     <u>The Trip to Colonial Williamsburg</u>**

14.     The fifth grade classes at NAPS travel every year to Colonial Williamsburg for a

field trip.[1]  (Doherty Dep. 121-22.)  Ms. Clouse made arrangements for this trip in January of 2017. The itinerary for the trip included a box lunch in the garden outside of Shields Tavern, followed by a tour of the historical area, dinner at Shields Tavern, a "Defense of Liberty" program and a colonial dance. (Doherty Dep. Ex. 20.)

15.    In January 2017, as part of the arrangements for the trip, Ms. Clouse approved meal orders for both the box lunch and dinner at Shields Tavern.  The orders clearly specify that Shields Tavern would prepare two gluten-free lunches and two gluten-free dinners.  (Doherty Dep. Exs. 17-18, attached hereto as Exhibits N-O respectively.)  J.D.'s father admits that Ms. Clouse had authority as NAPS director to negotiate these gluten-free meals on his behalf, but he denies that she informed him that she had done so.  (Doherty Dep. 129-31.)  However, it is undisputed that no one from NAPS or the Dohertys ever told CWF in advance of the trip that the Dohertys planned to bring their own food.  (Doherty Dep. 132-33; Clouse Dep. 45-46.)

16.    CWF has a policy that no outside food is allowed in its restaurants.  CWF has adopted this policy for two reasons.  First, the rule promotes food safety and protects CWF from liability.  CWF has no control over how outside food is prepared, and therefore cannot be sure if it is safe for someone to bring into the CWF Tavern and eat themselves or share with others.  On a related point, the policy is designed to prevent lawsuits and claims from patrons who visit the CWF Tavern, become sick from food brought in from the outside, and attempt to blame CWF for food poisoning.  Second, the policy promotes CWF's financial interests.  Its restaurants are businesses which must sell their food to remain financially viable.  (Florimonte Dep. 15-16, excerpts collectively attached hereto as Exhibit P.)  J.D.'s father acknowledges the legitimacy of

---

[1] J.D. and his family have been to Colonial Williamsburg many times prior to this, including five trips in the preceding two years.  They never visited Colonial Williamsburg taverns or other restaurants on any of these trips.  (Doherty Dep. 115-16.)

the second basis for the policy:

Q:  What do you think is behind the rule?

A:  I would assume a restaurant is in business to make money.

Q:  And do you understand and appreciate that?

Ms. Vargas:  Objection.  Vague.

A:  Yes.

(Doherty Dep. 120.)  J.D.'s father further testified "I can recognize the concern, fear of your client's and any other restaurant out there, I can understand that, that they would not want their restaurants to become covered picnic areas."  (Doherty Dep. 183.)

17.     CWF has limited exceptions to its no outside food policy not applicable here.  For example, CWF allows parents of babies and toddlers who are too young to order from the children's menu to bring baby food, Cheerios and other snack items.  It also will allow patrons to bring anniversary and birthday cakes and wine into the restaurant, but recoups revenue for this by a plating charge or corkage fee, and the risk of a foodborne illness from these items is low. (Florimonte Dep. 17-18.)

18.     On Monday, May 11th, the NAPS school group arrived in Colonial Williamsburg. Again, neither the school nor J.D.'s father advised CWF that the Dohertys planned to eat their own food at dinner that evening.  (Doherty Dep. 132-33; Clouse Dep. 45-46.)  In fact, the lead chaperone for NAPS confirmed the meal orders for two gluten-free lunches and dinners. (Deposition of Anne Chalkley "Chalkley Dep." Ex. 3 p. 5, attached hereto as Exhibit Q.)

19.     The school group then assembled at an outdoor seating area adjacent to Shields Tavern where they received their boxed lunches.  (Doherty Dep. 138-39.)  J.D.'s father photographed J.D. and the area where they ate, which is also where they ate their dinner later that

evening.  Contrary to the allegation in the complaint (*see* Compl. § 23), the area is covered and dry, as J.D.'s father now admits.  (Doherty Dep. 140, 188, Ex. 19 (attached hereto as Exhibit R).)

20.     After lunch, the NAPS school group toured the historic area with CWF guides and interpreters.  (Doherty Dep. Ex. 20.)

21.     At the conclusion of the tour of the historical area, the NAPS school group returned to Shields Tavern for dinner.  At the appointed time, they were ushered into the restaurant and told that they could seat themselves in certain rooms that had been reserved for them.  J.D. and his father selected a two-top table in a corner.  The Shields Tavern waitstaff had already placed salads at each diner's spot.  J.D.'s father ate his salad.  (Doherty Dep. 156-58.)

22.     Neither J.D.'s father nor anyone from the school had advised the waitstaff that they did not plan to eat their pre-ordered gluten-free meals.  (Doherty Dep. 132-33; Clouse Dep. 45-46.)  After finishing his salad, J.D.'s father began to unpack a cooler filled with not only food but also cups, utensils and plates.  (Doherty Dep. 159.)  J.D.'s father admitted that he had never attempted to do this in a restaurant before and it never dawned on him this might present a problem.

> Q:  You never tried bringing food into the restaurant before that you had cooked at home before this day, May 11th; is that right?
>
> A:  Correct.
>
> Q:  Did it occur to you, you know, that this could be a problem, therefore, it would be a good idea for me to ask somebody first?
>
> A:  No.
>
> Q:  Why not?
>
> A:  It didn't occur to me it would be an issue.

(Doherty Dep. 153-54.)

23.     A waitress spotted J.D.'s father unloading the contents of his cooler on the table

and promptly advised him that he couldn't bring in outside food to Shields Tavern pursuant to CWF policy.  (Doherty Dep. 159.)  J.D.'s father asked to speak to a manager, who had already heard from the waitress.  (Deposition of Dana Eason "Eason Dep." 30, excerpts collectively attached hereto as Exhibit S.)  The manager repeated the same policy, which she explained was mandated by state health code regulations.[2]  (Doherty Dep. 160.)  J.D.'s father rejected the gluten-free meals, saying he did not trust the Tavern.  (Doherty Dep. 135, 118.)

24.     The manager asked the Tavern's head chef to speak to J.D.'s father.  The chef came to his table and offered to prepare gluten-free chicken breasts and fingerling potatoes. [3]  (Doherty Dep. 161.)  The Tavern's chef is Cordon Bleu trained.  (Deposition of Anthony Zurowski "Zurowski Dep." 15, excerpts collectively attached hereto as Exhibit T.)  He also is certified by the Commonwealth of Virginia for completing "ServSafe" training, a program focusing on cross-contamination and safe food handling practices.  (Zurowski Dep. 16-17.)  The Tavern's menu contains gluten-free offerings and the staff regularly receives requests to prepare such meals.  (Deposition of Elizabeth Hatzidakis "Hatzidakis Dep." 32, excerpts collectively attached hereto as Exhibit U.)  The Tavern's chef estimates he prepares 4-5 gluten-free meals a day on average - or well over 1,000 per year.  He has never received a complaint in his five years working at Shields

---

[2] Virginia's health code prohibits Shields Tavern from serving food that was prepared in a private home, and also prohibits guests from consuming such food in the Tavern.  *See* 12 Va. Admin. Code 5-421-270(B) ("Food prepared in a private home shall not be used or offered for human consumption in a food establishment unless the home kitchen is inspected and regulated by the Virginia Department of Agriculture and Consumer Services.")  Additionally, the state's health code makes CWF responsible for the contamination of food in the Tavern, even if the contamination came from food carried into the Tavern by a guest.  *See* 12 Va. Admin. Code 5-421-690.

[3] Shields Tavern's chef testified that he had already prepared the meals.  (Zurowski Dep. 89.) J.D.'s father testified that the meals were not yet prepared but the chef offered to do them on the spot.  For the purposes of this motion, the Court must accept J.D.'s father's testimony as true.

that such a meal contained gluten. (Declaration of Tony Zurowski "Zurowski Decl." §§ 4-5, attached hereto as Exhibit V.) He thoroughly cleans his prep area before preparing gluten-free meals. (Zurowski Dep. 40.) He also cleans his cooking utensils and containers prior to preparing gluten-free meals, and he prepares gluten-free meals in a separate section of the kitchen. (Zurowski Dep. 37, 91, 93; Florimonte Dep. 42-43, 47, 49-50, 55-56, 59-60.) The Tavern obtains its gluten-free products from Sysco. (Zurowski Dep. 53-55.)

25.     J.D.'s father declined the chef's offer, saying he did not believe the restaurant could prepare the food safely. (Doherty Dep. 161.) When asked why he thought the Tavern's chef could not prepare a gluten-free meal for him that was safe to eat, J.D.'s father testified as follows:

> Q: What makes you think he couldn't eat the food there?
>
> A: The risk was too high.
>
> Q: Why?
>
> A: They just made 56 or so glutened – sorry – fried chicken meals. That flour is airborne. There is no way they would be able to clean the kitchen well enough to prepare food for [J.D.] and I.
>
> Q: But when you said that, you had no idea what the configuration of the kitchen is or what their cleaning or cooking techniques are?
>
> A: No.
>
> Q: No you are agreeing with me; you did not know?
>
> A: I did not know.

(Doherty Dep. 168.)

26.     Contrary to the allegations in the Complaint, J.D.'s father admits that they were not removed from the restaurant, nor were they forced to eat in the rain. Rather, J.D. and his father could have stayed in the restaurant and eaten the gluten-free meals previously ordered by the school and prepared by the Tavern. Alternatively, they could have stayed in the restaurant and not

10

eaten at all.  They only had to go outside if they insisted on eating their own food, which they did. (Doherty Dep. 133-34.)  But the area they went to, where they had had lunch earlier in the day, was covered and dry, as made clear by the attached exhibit.  (Doherty Dep. Ex. 19.)

27.    J.D. and his father were politely escorted by a waitress to the outdoor dining area. (Doherty Dep. 171.)  A few minutes after they arrived, they were joined by a costumed interpreter, "Big Dan McKenzie".  The Tavern's manager sent Big Dan to entertain them while they ate because she could tell they were upset.  Big Dan McKenzie was the only interpreter in the restaurant at the time, and he spent 15 or 20 minutes with J.D. and his father in an effort to cheer them up and boost their spirits while they ate.  (Chalkley Dep. 14, excerpts collectively attached hereto as Exhibit W.)  Big Dan remained in 18th century character throughout their conversation (Doherty Dep. 164), and learned during the course of the conversation that J.D. was interested in pirates.  This led Big Dan to tell J.D. stories of Blackbeard the pirate and his crew members who were jailed in Williamsburg in the early 1700's.  (Deposition of Daniel Hard "Hard Dep." 13-14, excerpts collectively attached hereto as Exhibit X.)  J.D. and his father received more personal attention than any other guest that evening from the Tavern's sole interpreter.  (Hard Dep. 22-23.) The waitstaff in the Tavern are not interpreters and have no special training regarding 18th century history.  Other than providing a brief description of the room the patrons are dining in, the waitstaff simply takes orders and delivers food.  (Chalkley Dep. 75-76.)

28.    As soon as they finished their meals, J.D. and his father returned to the restaurant where J.D.'s father and the other adults had coffee.  J.D. rejoined his school friends.  (Doherty Dep. 165.)  The Tavern manager contemporaneously documented what transpired in an email she sent to her manager when the school group departed.  (Chalkley Dep. Ex. 1, attached hereto as Exhibit Y.)

11

29.     When asked if he would handle the dinner at Shields Tavern differently with the benefit of hindsight, J.D.'s father posits only that maybe he should have insisted on eating his own food in the Tavern, even though he believed this would prompt a confrontation with the police. (Doherty Dep. 173.)

30.     After dinner, the group participated in the "Defense of Liberty" program in which the students were "recruited" to the local militia and taught how to muster and march.  (Doherty Dep. 145.)  On their way to the next event, the Colonial Dance, J.D.'s father returned briefly into the restaurant, demanded to see the manager and threatened to sue the restaurant for violating the Americans with Disabilities Act.  (Doherty Dep. 146-47.)  The Tavern's manager sent a second updated email to her manager immediately after the threatened litigation.  (Chalkley Dep. Ex. 2, attached hereto as Exhibit Z.)  The school group continued to the Colonial Dance, where J.D. had the opportunity to dance with a girl in his class whom he liked.  (Doherty Dep. 151-52.)  This brought the day's activities to an end.  The school group then went to the local CWF hotel, spent the night and left the next morning for Jamestown.  (Doherty Dep. 151, Ex. 20.)

## II.   LEGAL STANDARD

Summary judgment is appropriate where the record demonstrates "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A "genuine issue of material fact" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (emphasis omitted).  However, "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient" to survive summary judgment. *Id.* at 252.  Accordingly, to deny a motion for summary judgment, "[t]he disputed facts must be material to an issue necessary for the proper resolution of the case, and the quality and quantity of

the evidence offered to create a question of fact must be adequate to support a jury verdict."

*Thompson Everett, Inc. v. Nat'l Cable Advert., LP*, 57 F.3d 1317, 1323 (4th Cir. 1995).

### III.   ARGUMENT

CWF is entitled to summary judgment because Plaintiff is not disabled within the meaning of the Americans with Disabilities Act (ADA), the Rehabilitation Act, or the Virginians with Disabilities Act (VDA).[4]  Furthermore, CWF did not discriminate against Plaintiff because it offered him gluten-free meals during his visits to Shields Tavern.  The Plaintiff's father preferred that CWF allow him and his son to eat their own meals in the Tavern, but CWF did not have to provide that modification because it would have fundamentally altered the nature of the Tavern's business.

### A.   As A Matter Of Law J.D. Is Not Disabled, So CWF Had No Duty To Accommodate Him

The ADA prohibits places of public accommodation from discriminating against disabled individuals.  Discrimination includes:

> a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations.

---

[4] The ADA and Section 504 of the Rehabilitation Act require a plaintiff to prove the same elements to establish liability, so the two statutes can be construed similarly.  *See Halpern*, 669 F.3d at 461. The VDA can likewise be construed together with the ADA and the Rehabilitation Act.  *See Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal.*, 31 F.3d 209, 216 (4th Cir. 1994) ("[t]he VDA standards for liability follow the standards established in the federal Rehabilitation Act of 1973 and adopted in the ADA."); *Downie v. Revco Disc. Drug Centers, Inc.*, 448 F. Supp. 2d 724, 731 (W.D. Va. 2006) ("a plaintiff's rights under the VDA are coextensive with those under the ADA."). Consequently, ADA, VDA, and Rehabilitation Act case law can be applied to claims under the other statutes, and the Plaintiff's claims under these statutes fail for the same reasons.

42 U.S.C. § 12182(b)(2)(A)(ii).  To establish liability under this section in a retail setting (or analogous sections of the Rehabilitation Act and VDA), as Plaintiff attempts here, he must show that (1) he is disabled; (2) the defendant's establishment is a place of public accommodation; (3) the defendant has a discriminatory policy or practice in effect; (4) the plaintiff requested a reasonable modification to that policy or practice which, if granted, would have afforded him access to the desired goods; (5) the requested modification—or a modification like it—was necessary to afford that access; and (6) the defendant nonetheless refused to modify the policy or practice.  *Dudley v. Hannaford Bros. Co.,* 333 F.3d 299, 307 (1st Cir. 2003); *see also Callum v. CVS Health Corp.*, 137 F. Supp. 3d 817, 840 (D.S.C. 2015).  If the plaintiff makes this six-part showing, the defendant must make the requested modification unless it proves either that doing so would alter the fundamental nature of its business or that the requested modification poses a direct threat to the health or safety of others.   *Callum,* 137 F. Supp. 3d at 840.

Plaintiff's claim trips out of the gate because he is not disabled.  The ADA defines a "disability" as (i) a physical or mental impairment that (ii) substantially limits (iii) one or more major life activities.  *See* 42 U.S.C. § 12102(1)(A); *Haulbrook v. Michelin N. Am.*, 252 F.3d 696, 702 (4th Cir. 2001).  <u>CWF is not aware of any court holding that gluten-sensitivity is a disability</u>.  Courts do, however, consistently deny disability status to plaintiffs with Celiac Disease, a more severe form of gluten-intolerance.  In *Phillips v. P.F. Chang's China Bistro, Inc.*, No. 5:15-CV-00344-RMW, 2015 WL 4694049 (N.D. Cal. Aug. 6, 2015) ("*Phillips I*"), a restaurant case like this one, the court held that plaintiff's Celiac Disease was not a disability.  This disease does not "substantially limit" the major life activity of eating, the court reasoned, because the plaintiff could simply "avoid the consequences of her alleged disability by avoiding the ingestion of gluten." *Id.* at *4.

14

The court held similarly in *Kelly v. Kingston City Sch. Dist., Inc.*, No. 116-CV-00764-MAD/DJS, 2017 WL 976943 (N.D.N.Y. Mar. 13, 2017).  In this employment case, the plaintiff acknowledged that he could manage his Celiac Disease by avoiding gluten.  Consequently, the court held, "[p]laintiff has failed to plausibly allege that his celiac disease 'substantially limits' his ability to perform any major life activity. As a result, Plaintiff's celiac disease is not the type of protected impairment contemplated within the meaning of the ADA." *Id.* at *3 (internal citations omitted).  If Celiac Disease is not a disability, gluten-sensitivity in a less severe form, like the kind Plaintiff alleges, cannot be either.

These Celiac Disease cases are new, but food allergy cases are not, and the courts have consistently held that food allergies are not disabilities.  In *Land v. Baptist Med. Ctr.*, 164 F.3d 423, 425 (8th Cir. 1999), the Eighth Circuit held that a peanut allergy was not a disability because the allergy did not in any way restrict the plaintiff's ability to eat, only what she ate.  In *Slade v. Hershey Co.*, No. 1:09-CV-00541, 2011 WL 3159164 (M.D. Pa. July 26, 2011), the court likewise held that a plaintiff was not disabled due to a peanut allergy.  The *Slade* court held that, to determine if an impairment substantially limited a life activity, that impairment should be measured by "(i) the nature and severity of the impairment; (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact resulting from the impairment." *Id.* at *4.  The court held that the plaintiff's peanut allergy in that case was not a disability, even though the plaintiff's ingestion of peanuts caused her to stop breathing and could lead to her death, because the plaintiff "can cure her breathing problem through simple measures such as avoiding exposure to nuts and keeping medication on her person…. Because plaintiff can mitigate the symptoms of her allergy, she is not disabled under the ADA." *Id.* at *5.

The plaintiff denied disability status in *Phillips I* despite her Celiac Disease was eventually able to survive a motion to dismiss, but only by alleging symptoms that are not present in this case. In *Phillips v. P.F. Chang's China Bistro, Inc*., No. 5:15-CV-00344-RMW, 2015 WL 7429497 (N.D. Cal. Nov. 23, 2015) ("*Phillips II*"), the plaintiff bolstered her original complaint by alleging that her Celiac Disease caused "abdominal pain and cramping, diarrhea, bloating, impaired motor skills, vomiting, nausea, headaches, pins and needles, and fatigue" when she ingested gluten, and that this disease is "associated with an increased risk of developing cancer." *Id.* at *3. The *Phillips II* court held that a plaintiff may be able to show that these symptoms constitute a disability. But J.D. does not suffer from these symptoms. Indeed, J.D.'s father admits that J.D. does not suffer from Celiac Disease or the stomach pain typically associated with it. J.D.'s alleged symptoms are idiosyncratic—including ███████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████ As a matter of law, J.D.'s symptoms from his gluten-sensitivity do not constitute a disability.

Additionally, J.D.'s father admits that J.D. can avoid his unique set of symptoms simply by avoiding gluten. His father admits his health is good. If J.D. avoids gluten, there is nothing he cannot do in life other than his father's speculation that he will not be able to join the military when he becomes an adult. J.D. is, therefore, like the plaintiffs in *Phillips I, Kelly*, *Land*, and *Slade*, whose food allergies were denied disability status because the plaintiffs could avoid any symptoms simply by not ingesting their specific allergens. Following dietary restrictions does not make J.D. disabled. As the Ninth Circuit stated in *Fraser v. Goodale*, 342 F.3d 1032, 1041 (9th Cir. 2003), "[n]ot every impediment to the copious and tasty diets our waistlines and hearts cannot endure is a substantial limitation of the major life activity of eating. We must carefully separate those who

16

have simple dietary restrictions from those who are truly disabled." J.D. can eliminate his symptoms by avoiding gluten. Thus, he is not disabled.

This fact alone concludes Plaintiff's case, no matter what happened to him during his visit to Shields Tavern. The ADA does not establish a standard for service in the restaurant industry. *See Krist v. Kolombos Rest. Inc.,* 688 F.3d 89, 93 (2d Cir. 2012) (quoting district court: "the ADA doesn't prohibit the conduct at issue here…even if done in a rude and insensitive manner… That is not what the ADA is intended to reach. This [restaurant] may have been thought of like [the TV show] Cheers, but the ADA does not guarantee that kind of atmosphere."). Nor does the ADA establish a civility code for restaurant managers. *See id.* at 97 ("the ADA does not impose a civility code."). The ADA protects disabled individuals from discrimination, but it does not require the special treatment J.D.'s father demanded. *See Detko v. Blimpies Rest.*, 924 F. Supp. 555, 556 (S.D.N.Y. 1996) (dismissing ADA claim by individual with a speaking stutter, even though restaurant manager yelled at plaintiff to "hurry it up" when he was ordering his sandwich, then "threw [plaintiff's] sandwich in the garbage," "grabbed [plaintiff] by the neck and dragged him out of the restaurant," because speech impediment was not a disability). Therefore, J.D.'s lack of a disability is fatal to his case, regardless of whether Shields Tavern attempted to accommodate his gluten-sensitivity.

**B.    CWF Did Not Discriminate Against J.D. Because It Offered Him Gluten-Free Meals**

J.D.'s claims also must be dismissed because CWF offered him gluten-free meals at no extra charge.

The ADA requires that public accommodations provide "reasonable" modifications to guests with disabilities. *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 464 (4th Cir. 2012). But a disabled guest is not entitled to the accommodation of his choice. *Callum*, 137 F.

Supp. 3d at 840.  Rather, once a public accommodation has offered an effective modification to its policies or practices that allows a disabled patron to enjoy the goods or services provided by the public accommodation, it cannot be found liable under the ADA.  *See Montalvo v. Radcliffe,* 167 F.3d 873, 879 (4th Cir. 1999) ("[w]hile an ADA plaintiff is under no obligation to accept a proffered, otherwise reasonable modification…such rejection does not impose liability on [defendant] for failure to modify its program.").

It is undisputed that CWF offered to prepare J.D. gluten-free meals.  Shields Tavern's chef is "ServSafe" certified, meaning he received training focused on eliminating cross-contamination. He estimates that he prepares 4-5 gluten-free meals per day—or well over 1,000 per year. In his five years at Shields Tavern he has never received a single complaint that the gluten-free meals he prepared actually included gluten.  The Tavern's chef thoroughly cleans his prep area and cooking tools before preparing gluten-free meals, to eliminate cross-contamination.  He prepares gluten-free meals in a separate section of the kitchen to avoid any traces of gluten from prior food preparation.  Simply put, although no accommodation was required, CWF offered one that has proven to be effective, meal after meal, year after year.

Therefore, CWF's offered modification—meals prepared without gluten in a gluten-free environment—was a reasonable and effective accommodation to J.D.'s alleged disability.  This accommodation derails Plaintiff's discrimination claim.  The court reached the same conclusion in *Phillips I*, in which a restaurant offered to provide gluten-free meals *at an additional cost of $1 per menu item.  See* 2015 WL 4694049 at *4-6.  CWF offered to prepare Plaintiff gluten-free meals at no extra cost.  If charging extra for gluten-free meals is a reasonable accommodation to a gluten-intolerance, than providing such meals at no extra cost must be, as well.

That J.D. and his father may have preferred to dine on food they brought into Shields Tavern is irrelevant.  "The ADA does not require a public entity to provide a disabled individual with the accommodation of his choice."  *Callum*, 137 F. Supp. 3d at 840.  Once CWF offered Plaintiff an effective and reasonable accommodation, it could not be found liable of failing to accommodate Plaintiff.  *See Montalvo*, 167 F.3d at 879; *see also Coleman v. Phoenix Art Museum*, No. CV 08-1833PHXJAT, 2009 WL 1097540, at *1 (D. Ariz. Apr. 22, 2009), *aff'd sub nom.*, 372 F. App'x 793 (9th Cir. 2010) (holding that museum did not violate ADA when it prevented patron from bringing his "unique hip chair" into museum, out of fear that it may injure other patrons, given that museum did offer patron other wheelchair options).

**C.**     **Allowing J.D. And His Father To Dine On Their Own Food Would Have Fundamentally Altered The Nature of Shields Tavern's Business**

The Court should also dismiss J.D.'s case because CWF did not have to abandon its no-outside-food policy and allow J.D. and his father to eat their own food in Shields Tavern. This demand was unreasonable, and it would have fundamentally altered the Tavern's business as a restaurant that earns revenue by serving food.

"Federal law mandates that…public accommodations make 'reasonable,' but not 'substantial' or 'fundamental,' modifications to accommodate persons with disabilities." *Halpern*, 669 F.3d at 464.  The Fourth Circuit articulated the standard that applied here succinctly in *Halpern*:

> A modification is not reasonable if it either imposes undue financial and administrative burdens or requires a fundamental alteration in the nature of the program.  A modification to an essential aspect of the program constitutes a fundamental alteration and, therefore, is an unreasonable accommodation.
>
> Although determination of the reasonableness of a proposed modification is often fact-specific, a court may grant summary judgment in favor of a defendant if the plaintiff fails to present evidence from which a jury may infer that the accommodation is

reasonable on its face, *i.e.,* ordinarily or in the run of cases, or if the defendant establishes as a matter of law that the proposed modification will cause undue hardship in the particular circumstances.

*Id.* (internal citations and quotations omitted).

J.D. must show that his proposed modification—eating food that he brought into the restaurant and eschewing any food prepared by Shields Tavern—is reasonable "ordinarily or in the run of cases." *Id.* He cannot. No-outside-food policies are extraordinarily common in the restaurant industry. They are grounded in financial necessity, food safety and risk mitigation. They are consistent with health code regulations promulgated by the Commonwealth. The modification demanded by J.D.'s father would fundamentally alter the nature of Shields Tavern's business as a restaurant that serves food to guests for a charge. J.D.'s father acknowledged as much in his deposition when he testified that restaurants like Shields Tavern are "in business to make money." He also acknowledges that allowing other guests to do as he proposed, in the run of cases, would turn restaurants into "covered picnic areas." Food service is "an essential aspect" — *the* essential aspect, in fact—of Shields Tavern's business, and the modification that Plaintiff proposed would fundamentally alter the nature of this service. *See id.* Indeed, it would supplant the service altogether.

In addition to fundamentally altering Shields Tavern's business, this proposed modification is also unreasonable because of the financial burden it would place on CWF. "A modification is not reasonable if it…imposes undue financial and administrative burdens" *Id.* Allowing restaurant patrons to enjoy the tavern experience while eating their own food would impose a financial burden on Shields Tavern because it would deprive the Tavern of its only source of revenue: food sales. Therefore, allowing guests to eat their own food instead of purchasing food would cause the Tavern to lose money, threatening its viability as a going concern. The ADA does not require such

20

sacrifice. *See Gathright-Dietrich v. Atlanta Landmarks, Inc.,* 452 F.3d 1269, 1275 (11th Cir. 2006) (historic theater did not have to eliminate regular seats to accommodate handicapped patrons because this "would directly impact [the theater's] ability to compete with other venues, possibly resulting in lost revenue."); *Emery v. Caravan of Dreams, Inc*., 879 F. Supp. 640, 644 (N.D. Tex. 1995) (music venue did not have to ban smoking because this modification "would endanger Defendant's viability as a business, and such modifications are not required.").

The Fourth Circuit's holding in an analogous circumstance in *Montalvo* is instructive here. In that case, a father tried to enroll his 12-year-old son in a karate school known as U.S.A. Bushidokan.  The son wanted to join this karate school in particular because his friends had already started lessons there.  But the son had AIDS, and U.S.A. Bushidokan was a "combat-oriented" school in which the students' sparring was often bloody.  The school denied the boy's enrollment, fearing that he may transmit AIDS to other students.  The father argued that the karate school should have "soften[ed]" its karate program to accommodate his son.  The Fourth Circuit disagreed, holding that the school was not required to make such a fundamental alteration:

> U.S.A. Bushidokan's unique niche in the martial arts market was its adherence to traditional, "hard-style" Japanese karate, and the contact between participants, which causes the bloody injuries and creates the risk of HIV transmission, was an integral aspect of such a program. To require U.S.A. Bushidokan to make its program a less combat-oriented, interactive, contact intensive version of karate would constitute a fundamental alteration of the nature of its program. The ADA does not require U.S.A. Bushidokan to abandon its essential mission and to offer a fundamentally different program of instruction.

*Montalvo*, 167 F.3d at 879 (emphasis added).  By the same token, CWF was not required to abandon its essential mission of food service to offer a fundamentally different product—"a picnic area" —to accommodate J.D.'s alleged disability.

21

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, CWF moves this Court to dismiss Plaintiff's claims with prejudice, enter summary judgment for CWF, and for such other and further relief as this Court deems just and proper.

Dated: January 19, 2018                    Respectfully submitted,

**COLONIAL WILLIAMSBURG**
**FOUNDATION**

By: _____/s/_____

Robert W. McFarland (VSB # 24021)
McGuireWoods LLP
World Trade Center
101 West Main Street, Ste 9000
Norfolk, Virginia 23510
(Office) (757) 640-3716
(Fax) (757) 640-3966
rmcfarland@mcguirewoods.com

Dana L. Rust (VSB # 28408)
Micah B. Schwartz (VSB # 77299)
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, Virginia  23219
(Office) (804) 775-1000
(Fax) (804) 698-2158
drust@mcguirewoods.com
mschwartz@mcguirewoods.com

*Counsel for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 19th day of January, 2018, a true copy of the foregoing was filed with the Court using the CM/ECF system, which will send notification of such filing to the following.  Additionally, unredacted versions of the foregoing and exhibits attached were served via electronic mail to the following.

Michael S. Stein
Mary Vargas
STEIN & VARGAS, LLP
840 First Street, NE
Third Floor
Washington, DC 20002


/s/
_____
Robert W. McFarland (VSB # 24021)
McGuireWoods LLP
World Trade Center
101 West Main Street, Ste 9000
Norfolk, Virginia 23510
(Office) (757) 640-3716
(Fax) (757) 640-3966
rmcfarland@mcguirewoods.com

Dana L. Rust (VSB # 28408)
Micah B. Schwartz (VSB # 77299)
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, Virginia  23219
(Office) (804) 775-1000
(Fax) (804) 698-2158
drust@mcguirewoods.com
mschwartz@mcguirewoods.com

*Counsel for Defendant*

23