## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Newport News Division

J.D.,
by his father and next friend, BRIAN DOHERTY,

        Plaintiff,

v.                                      Action No. 4:17cv101

COLONIAL WILLIAMSBURG FOUNDATION,

        Defendant.

### UNITED STATES MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

This matter comes before the Court on a motion for summary judgment filed by defendant Colonial Williamsburg Foundation ("CWF"). ECF No. 19. The motion was referred to the undersigned United States Magistrate Judge on February 9, 2018, pursuant to 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b). ECF No. 32. For the reasons discussed below, the undersigned recommends that CWF's motion be GRANTED.

### I.  PROCEDURAL BACKGROUND

On July 19, 2017, the minor plaintiff, J.D., by his father and next friend Brian Doherty, filed suit in this Court against CWF, alleging violations of section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12182–12189; and the Virginia Rights of Persons with Disabilities Act ("VDA"), Va. Code Ann. § 51.5. Complaint ("Compl."), ECF No. 1. CWF answered on August 21, 2017. ECF No. 5. On January 19, 2018, CWF filed the pending motion for summary judgment, with an attached

memorandum. ECF Nos. 19–20.[1] J.D. responded in opposition to the motion on February 2, 2018, with sealed attachments. ECF Nos. 27–29. CWF replied on February 8, 2018. ECF No. 31. A final pretrial conference was held on February 23, 2018, ECF No. 48, but the trial date was removed from the calendar on February 26, 2018, ECF No. 49, pending resolution of CWF's summary judgment motion.

## II.    FACTUAL BACKGROUND

The following facts have been gathered from the complaint, the stipulated facts in the final pretrial order, and exhibits appended to the summary judgment filings, including excerpts of deposition testimony. Where there are inconsistencies among these sources, the Court recounts the facts in the light most favorable to the plaintiff, while also noting pertinent factual disputes.

On May 11, 2017, J.D., an 11-year-old boy, traveled to Colonial Williamsburg as part of a trip organized by the Naval Academy Primary School ("NAPS"), where he was a student at the time. Compl. ¶ 1, ECF No. 1; Deposition of Brian Doherty, 121:12–122:13, ("B. Doherty Dep.").[2] He was accompanied by his father, Brian Doherty, NAPS teachers, other parents, and approximately 30 of his classmates. B. Doherty Dep. 121:12–122:13, 138:10–138:20; ECF No. 27-14 (revised final invoice reflecting 57 lunches and 57 dinners to be provided by Shields Tavern). On that evening, the school group dined at Shields Tavern in Colonial Williamsburg, where the incident that forms the basis of this suit took place. Compl. ¶ 18.

---

[1] Portions of the memorandum related to J.D.'s health records were redacted and an unredacted memorandum was filed under seal. ECF No. 23. Information related to J.D.'s health records is redacted in this report and recommendation, and an unredacted report and recommendation will be filed under seal.

[2] Excerpts from Brian Doherty's deposition are located at ECF Nos. 23-1, 27-3, 31-1.

J.D. suffers from several health problems. Most relevant here, J.D. asserts that he suffers from either celiac disease or non-celiac gluten sensitivity ("NCGS").[3] J.D.'s father testified at his deposition that J.D. experiences a constellation of adverse symptoms when he ingests gluten, including [redacted] B. Doherty Dep. 33:22–34:13, 47:4–47:21. [redacted] B. Doherty Dep. 36:9–36:22, [redacted] affidavit of Kristin Doherty ¶ 4, ECF No. 27-1, ("K. Doherty Aff."). His father testified, however, that J.D. does not have the [redacted] that is often associated with celiac disease. B. Doherty Dep. 47:23–47:24. According to Anthony L. Guerrerio, M.D. ("Dr. Guerrerio"), a pediatric gastroenterologist with Johns Hopkins Hospital and J.D.'s primary treating physician, both celiac disease and NCGS are treated with a strictly gluten-free diet.[6] Guerrerio Aff. ¶ 15.

---

[3] Celiac disease is an autoimmune disorder that causes damage to the small intestine when a person with the disease ingests gluten, and can cause symptoms including "fatigue, cognitive impairment, abdominal pain, constipation and/or diarrhea, bloating, weight or growth failure, vitamin deficiency, anxiety, problems with mood and memory, dermatitis herpetiformis, peripheral neuropathy, and elevated liver enzymes." Affidavit of Dr. Anthony L. Guerrerio ¶ 11 ("Guerrerio Aff."), ECF No. 27-4. NCGS is a disorder that can cause symptoms similar to celiac disease, but without "tissue transglutaminase, anti-endomysial reactivity, deamidated gliadin antibodies, and villi damage." *Id.* ¶ 12. Celiac disease may lead to additional serious health problems, such as intestinal cancer, but NCGS does not necessarily lead to an increased risk for such health problems. *Id.* ¶¶ 11–12.

[4] J.D.'s medical records elsewhere indicate [redacted] *See, e.g.*, ECF No. 23-5 at 1; ECF No. 23-9 at 1.

[5] [redacted] B. Doherty Dep. 62:3–62:13. Doherty testified that he believed J.D. ingested gluten at that time, but did not know the source. B. Doherty Dep. 62:14–62:23.

[6] [redacted] ECF Nos. 23-4 at 1–2, 23-5 at 1; *see also* B. Doherty

Brian Doherty further testified that, if J.D. maintains a gluten-free diet, he does not experience the same health problems he experiences when he ingests gluten.  B. Doherty Dep. 46:18–46:20.  Kristin Doherty, J.D.'s mother, stated in an affidavit that when J.D. is gluten-free, "the change in his quality of life and his health [is] nothing short of miraculous."  K. Doherty Aff. ¶ 6, ECF No. 27-1.  When asked what J.D. is unable to do on account of his condition, Brian Doherty stated that J.D. ███████████████████████████████████████████

███████████████████████████████████████████████████████████████████

█████████████████████████████████████  B. Doherty Dep. 46:2–46:13.  He also testified that

███████████████████████████████████████████████████████████████████

██████████  B. Doherty Dep. 45:23–45:25.  J.D. takes Tae Kwon Do classes, and Brian Doherty testified that J.D. is not precluded from any sports on account of his condition.  B. Doherty Dep. 48:25–49:7.

The itinerary for the May 11, 2017 trip to Colonial Williamsburg included a boxed lunch outside, provided by Shields Tavern, a tour of the historical area, dinner at Shields Tavern, a "defense of liberty" program, and a colonial dance.  ECF No. 27-12; B. Doherty Dep. 138:18–138:7, 145:7–145:24, 151:14–151:16.  J.D. and his family had never previously eaten at Shields Tavern, B. Doherty Dep. 116:22–116:25, which, like the rest of Colonial Williamsburg, seeks to offer guests a traditional, eighteenth-century experience, which includes costumed reenactors and



Dep. 39:20–41:4

ECF No. 28-5 at 1.

Guerrerio Aff. ¶¶ 15–16.  Dr. Guerrerio opines that a gluten-free diet is medically necessary for J.D.  Guerrerio Aff. ¶ 18.

musicians. ECF No. 27-12; Deposition of Dan Hard 10:8–10:23, 11:16–12:3 ("Hard Dep.).[7]

Devon Clouse, the director of NAPS, placed an order with Colonial Williamsburg for both the

boxed lunch and the dinner, which specified that Shields Tavern would prepare two gluten-free

lunches and two gluten-free dinners. ECF Nos. 20-14, 20-15. The parties dispute whether these

gluten-free meals were intended for J.D. and his father or for other members of the party. There

is no evidence in the record of other members of the party requiring or eating gluten-free meals.

On the evening of May 11, 2017, members of the NAPS school group were ushered into

Shields Tavern and selected their seats, with J.D. and his father selecting a two-person table in

the corner of the room. B. Doherty Dep. 156:5–156:21. Tavern staff had already placed salads,

with gluten-containing ranch dressing, at each diner's place prior to the group's arrival. B.

Doherty Dep. 157:10–157:15, 158:11; Deposition of Dana Eason 29:2–29:8 ("Eason Dep.").[8]

J.D.'s father ate his salad, informed the server that he and J.D. would not be eating the

restaurant's food, and then began to unpack a cooler filled with food he had prepared prior to

arrival. B. Doherty Dep. 158:17–159:13. He also began to unpack plates and plastic ware that

he had brought from home. B. Doherty Dep. 159:11–159:13; ECF No. 20-25. J.D.'s family did

not inform CWF beforehand that they would be bringing their own food into the restaurant.[9] B.

Doherty Dep. 132:7–132:17. There is also no evidence in the record that they inquired about the

---

[7] Dan Hard is a costumed entertainer who played the role of Big Dan McKenzie at Shields
Tavern on May 11, 2017. Excerpts from his deposition can be found at ECF Nos. 20-24, 27-13.
He attempted to entertain J.D. and his father with stories as they ate their meal outside Shields
Tavern. Hard Dep. 12:22–13:5, 13:16–14:22.

[8] Excerpts of Dana Eason's deposition can be found at ECF Nos. 20-19, 27-9, 31-7. She was one
of the servers at Shields Tavern that night.

[9] There are, however, several references in the record to an email written by Brian Doherty to
NAPS on January 8, 2017, months before the trip on May 11, 2017, where Doherty informed
NAPS that he would be bringing his own food for himself and J.D. ECF No. 46-4 at 7; B.
Doherty Dep. 126:9–126:25, 129:4–129:15, 131:2–131:7; Deposition of Devon Clouse 45:2–
45:10. The relevant excerpt of Devon Clouse's deposition is located at ECF No. 23-2.

restaurant's protocols in preparing gluten-free meals. J.D.'s father had never tried bringing food prepared at home into a restaurant before. B. Doherty Dep. 153:24–154:30.

CWF has a policy against allowing outside food into its restaurants. Deposition of Mark Florimonte, 15:17–16:2 ("Florimonte Dep.").[10] CWF has two exceptions to this policy: (1) parents of babies and toddlers too young to order from the main menu may bring in baby food and other snacks for the infants; and (2) patrons may bring cakes and wine into the restaurant for events, for which CWF charges a plating or corkage fee. Florimonte Dep. 17:16–18:20. According to Mark Florimonte ("Florimonte"), the director of food and beverages in Colonial Williamsburg, the policy promotes food safety and financial stability. Florimonte Dep. 16:3–16:4. Specifically, CWF not only has liability concerns about people getting sick from food they bring in and asserting claims against CWF, but also the practice of allowing patrons to bring in outside food undermines CWF's ability to sell its own food to those patrons.[11] Florimonte Dep. 16:5–16:18.

After Mr. Doherty began to unpack his and J.D.'s meals, a server informed him that he could not bring in outside food because it was a health code violation[12] and against CWF policy.

---

[10] Excerpts from Mark Florimonte's deposition are located at ECF Nos. 20-16, 27-15, 31-3.

[11] At his deposition, Florimonte described a situation where a child's mother called two weeks ahead of time, explained that her child suffered "around 30 allergies" and asked if she could bring a chicken breast into the restaurant for her son. Florimonte Dep. 107:9–108:11. Florimonte granted her an exception to the policy after determining that the restaurant would be unable to accommodate a child with such a vast array of allergies. Florimonte Dep. 108:2–108:7. Florimonte testified that managers have discretion to allow exceptions to the policy if the customer communicates the need for an exception ahead of time, and the restaurant cannot accommodate the customer's needs. Florimonte Dep. 136:4–136:17.

[12] The Virginia health code provides that "[f]ood prepared in a private home shall not be used or offered for human consumption in a food establishment unless the home kitchen is inspected and regulated by the Virginia Department of Agriculture and Consumer Services." 12 Va. Admin. Code 5-421-270(B). J.D. has filed a motion *in limine* seeking to exclude from trial any evidence or testimony related to the health code. ECF Nos. 39–40. He argues that the code is irrelevant

B. Doherty Dep. 159:15–159:22. Mr. Doherty asked to see the manager, who reiterated CWF's no-outside food policy and informed him that, if he desired to eat the food brought from home, he would have to do so outside of the restaurant. B. Doherty Dep. 160:7–160:14. Shortly thereafter, the Tavern's head chef, Anthony Zurowski ("Zurowski"), entered the dining area and offered to prepare a gluten-free chicken breast and fingerling potatoes.[13] B. Doherty Dep. 132:3–132:6, 161:7–161:16.

Zurowski received two years of schooling from Cordon Bleu, where he took a class on how to prepare meals for those with special needs, due to dietary restrictions and otherwise, including how to prepare gluten-free meals. Deposition of Anthony Zurowski 15:23–16:4, 16:9–17:5 ("Zurowski Dep.").[14] He is certified through a national certification called ServSafe, which focuses on safe handling, storage, production, and cooking of food. Zurowski Dep. 16:15–16:19 (discussing that "the principal purpose of ServSafe [is] to maintain . . . awareness of cross-contamination and proper food handling and cooking"), 17:6–17:14; Florimonte Dep. 51:13–51:22 (discussing that all Colonial Williamsburg's chefs are required to undergo ServSafe training, which includes training about allergies generally and gluten sensitivity specifically). Zurowski is not certified by a program called AllerTrain, which trains chefs in the proper

---

because it does not prohibit Shields Tavern from allowing guests to bring in outside food to eat themselves. *Id.* The Court need not reach that dispute in addressing this summary judgment motion.

[13] Zurowski testified in his deposition that he had already prepared the gluten-free meals. *See* ECF No. 23 at 11 n.3; *see also* ECF No. 20-25 (email from Anne Chalkley, manager of Shields Tavern, to Mark Florimonte stating that Zurowski had already prepared the meals and that she explained as much to Brian Doherty). Brian Doherty testified that Zurowski offered to prepare them on the spot. B. Doherty Dep. 161:13–161:16. As CWF acknowledges is appropriate, ECF No. 23 at 11 n.3, for the purposes of this motion, the Court credits Brian Doherty's version of this event.

[14] Excerpts of Zurowski's deposition are located at ECF Nos. 20-20, 27-8, 31-4.

preparation of allergy-safe and gluten-free meals.  Zurowski Dep. 56:13–56:19, Deposition of

Julie Rasmussen ("Rasmussen Dep.") 42:23–44:13.[15]  Zurowski has also received one-on-one

training from CWF's head chef with respect to gluten-free food preparation.  Zurowski Dep.

20:3–20:24.  He has further attended workshops with other CWF chefs, some of which have

focused on gluten-free, vegetarian, and dairy-free meal preparation.  Zurowski Dep. 59:2–60:15.

When a special request is made, such as for a gluten-free meal, Zurowski, rather than one of his

staff, always prepares the meal.  Zurowski Dep. 63:17–63:23.

Doherty declined Zurowski's offer to prepare a gluten-free meal and testified that he did

not trust the Tavern to be able to safely prepare gluten-free meals for J.D. after preparing fried-

chicken meals for the rest of the diners.  B. Doherty Dep. 161:13–161:23; *see also* ECF No. 20-

25 (email from Anne Chalkley stating that Brian Doherty told her he did not trust the restaurant).

J.D. and his father knew that they had the option to stay inside the restaurant and either eat a

meal prepared by Shields Tavern, or eat the meal they brought themselves at a later time.  B.

Doherty Dep. 134:12–135:20.  J.D. and his father insisted on eating the meal brought from home,

and so a server walked them out of the restaurant and through the back door.  B. Doherty Dep.

134:9–134:11, 161:24–161:25.  J.D. and his father ate their meal at picnic tables behind Shields

Tavern underneath a covered pavilion.  B. Doherty Dep. 139:4–139:18.  After eating their meals

outside for approximately 20 to 30 minutes, J.D. returned to the restaurant for the remainder of

the group's time at the Tavern.  B. Doherty Dep. 165:6–165:18.

### III.    STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure permits a party to move for summary

judgment and directs a Court to grant such motion "if the movant shows that there is no genuine

---

[15] Julie Rasmussen is plaintiff's expert witness and her deposition can be found in its entirety at
ECF No. 36-1.

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party "seeking summary judgment always bears the initial responsibility of informing the [court] of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quotations omitted).  Subsequently, the burden shifts to the non-moving party to present specific facts demonstrating that a genuine dispute of material fact exists for trial.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.").  For the evidence to present a "genuine" dispute of material fact, it must be "such that a reasonable jury could return a verdict for the non-moving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When deciding a motion for summary judgment, the Court must view the facts, and inferences to be drawn from the facts, in the light most favorable to the non-moving party.  *Id.* at 255.

A "party asserting that a fact cannot be or is genuinely disputed must support the assertion by:  (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c).  When ruling on a summary judgment motion, "a court may also give credence to other facts supporting the movant, regardless of their source, if such facts are

9

not challenged by the non-moving party because a failure to challenge proffered facts may render such facts 'admitted.'" *XVP Sports, LLC v. Bangs*, No. 2:11cv379, 2012 WL 4329258, at *4 (E.D. Va. Sept. 17, 2012); *see also* Fed. R. Civ. P. 56(c)(3) (noting a court "may consider other materials in the record").

As specified in Local Civil Rule 56(B), "the Court may assume that facts identified by the moving party in its listing of [undisputed] material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." E.D. Va. Loc. Civ. R. 56(B). The Court has construed the facts in the light most favorable to plaintiff and identified which material facts are, and are not, disputed.

## IV.   ANALYSIS

J.D., through his father, brings suit pursuant to section 504 of the Rehabilitation Act, 29 U.S.C. § 794; Title III of the ADA, 42 U.S.C. §§ 12182–12189; and the VDA, Va. Code Ann. § 51.5. ECF No. 1. The ADA and the Rehabilitation Act can be analyzed together. *See Halpern v. Wake Forest Univ. Health Sci.*, 669 F.3d 454, 461 (4th Cir. 2012) (stating, in a Title III context, "[t]o the extent possible, we construe the ADA and Rehabilitation Act to impose similar requirements. Thus, despite the different language these statutes employ, they require a plaintiff to demonstrate the same elements to establish liability.") (internal citations omitted); *Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 535 n.12 (3d Cir. 2007) ("Although the language of the ADA and Rehabilitation Act differs, the standards for determining liability under the two statutes are identical."); *see also Coursey v. Univ. of Md. Eastern Shore*, 577 F. App'x 167, 173–74 (4th Cir. 2014); *Davis v. Mabus*, No. 2:12cv467, 2013 WL 12099349, at *2 (E.D. Va. Sept. 26, 2013); *Cone ex rel. Cone v. Randolph Cty. Schs.*, 302 F. Supp. 2d 500, 513 (M.D.N.C. 2004), *aff'd*, 103 F. App'x 731 (4th Cir. 2004).

Similarly, the "VDA standards for liability follow the standards established in the federal Rehabilitation Act of 1973 and adopted in the ADA." *Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal.*, 31 F.3d 209, 216 (4th Cir. 1994) (citing *Eastman v. Va. Polytechnic Inst.*, 732 F. Supp. 665, 666 (W.D. Va. 1990), *aff'd on other grounds*, 939 F.2d 204 (4th Cir. 1991)); *see also Hoye v. Clarke*, No. 7:14cv124, 2015 WL 3407609, at *9 (W.D. Va. May 27, 2015) (noting that the VDA "'was modeled after and is almost identical to the Rehabilitation Act.'") (quoting *Wolsky v. Med. Coll. of Hampton Roads*, 1 F.3d 222, 224 (4th Cir. 1993)). Accordingly, the Court will analyze the three laws together for the purposes of this summary judgment motion, as also suggested by the parties in briefing the pending motion. ECF No. 23 at 15 n.4; ECF No. 27 at 17 n.1.

Title III of the ADA is intended to facilitate disabled individuals' access to public places of accommodation. *Nanni v. Aberdeen Marketplace, Inc.*, 878 F.3d 447, 453 (4th Cir. 2017); *see* 42 U.S.C. § 12101(a)–(b) (detailing congressional findings and purpose of the ADA). The general rule of Title III is that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a). Title III defines discrimination to include:

> a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations.

42 U.S.C. § 12182(b)(2)(A)(ii). To prevail under Title III, a plaintiff must demonstrate: (1) he is disabled within the meaning of the ADA; (2) the defendant owns, leases, or operates a place of public accommodation; and (3) the defendant denied the plaintiff access to its public accommodations on the basis of plaintiff's disability. *Callum v. CVS Health Corp.*, 137 F. Supp.

3d 817, 839 (D.S.C. 2015) (citing 42 U.S.C. § 12182(a)–(b)).   Restaurants are expressly designated as public accommodations under the ADA, 42 U.S.C. § 12181(7)(B), and the parties do not contest this element.   Thus, the Court will address whether J.D. has a disability and whether CWF denied him a full and equal opportunity to partake of its accommodations.

A.   **A genuine dispute of material fact exists as to whether J.D. is a "person with a disability."**

The ADA defines a disability, as relevant here, as "a physical or mental impairment that substantially limits one or more major life activities."  42 U.S.C. § 12102(1)(A).  A physical impairment is "[a]ny physiological disorder or condition . . . affecting one or more body systems, such as:  Neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine." 28 C.F.R. § 36.105(b)(1).[16]  An impairment may be considered a disability "if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population."  28 C.F.R. § 36.105(d)(1)(v).  Not every impairment is considered a disability under the ADA.  *Id.*  "An impairment does not need to prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting."  *Id.*  Major life activities are either the "operation of a major bodily function," or those basic tasks of everyday living, such as "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, [and] lifting." 42 U.S.C. § 12102(2).

In 2008, Congress passed the ADA Amendments Act ("ADAAA"), Pub. L. No. 110-325, 122 Stat. 3553, which broadened the scope of what may be considered as a disability.  The

---

[16] The purpose of part 36 of title 28 of the Code of Federal Regulations is to implement subtitle A of Title III of the ADA, as amended by the ADA Amendments Act of 2008. 28 C.F.R. § 36.101(a).

ADAAA became effective on January 1, 2009.   122 Stat. 3553 § 8; 42 U.S.C. § 12101. Congress passed the ADAAA to respond to a series of Supreme Court decisions that Congress believed improperly narrowed the range of impairments that could be considered disabilities under the ADA.   122 Stat. 3553 § 2(b); *Summers v. Altarum Inst. Corp.*, 740 F.3d 325, 329 (4th Cir. 2014).   Specifically, Congress rejected the Supreme Court's reasoning in *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999), that courts should consider the positive effects of mitigating measures when deciding whether an impairment substantially limits a major life activity, and in *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002), that the terms "substantially" and "major" need to be interpreted "strictly to create a demanding standard for qualifying as disabled."   122 Stat. 3553 § 2; *see also* 42 U.S.C. § 12102(4)(B) ("The term 'substantially limits' shall be interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008.").   Instead, the ADAAA "clarified that the phrase 'substantially limits' is not intended "to be a demanding standard.'"   *O'Reilly v. Gov't of the V.I.*, No. 11-81, 2015 WL 4038477, at \*6 (D.V.I. June 30, 2015) (holding that the plaintiff stated a claim that her mold allergy constituted a disability); 28 C.F.R. § 36.105(c)(2)(i).   In passing the ADAAA, Congress made clear that "the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations," and "the question of whether an individual's impairment is a disability . . . should not demand extensive analysis."   122 Stat. 3553, § 2(b)(5); 42 U.S.C. § 12102(4)(B); 28 C.F.R. § 36.101(b).

Further, the ADAAA inserted rules of construction for courts to follow when determining whether an impairment qualifies as a disability.   Most relevant here are the ADAAA's commands that (1) courts should not consider the "ameliorative effects of mitigating measures" in deciding whether an impairment substantially limits a major life activity; and (2) an episodic

13

impairment is still a disability if it substantially limits a major life activity "when active." 42 U.S.C. § 12102(4)(D), (E)(i)–(ii).   The ADAAA lists examples of mitigating measures that should not be considered, including "medication, medical supplies, equipment, or appliances . . . ; use of assistive technology; reasonable accommodations or auxiliary aids or services; or learned behavioral or adaptive neurological modifications."   42 U.S.C. § 12102(4)(E)(i) (emphasis added).   As stated by the Ninth Circuit, "[i]mpairments are to be evaluated in their *unmitigated* state, so that, for example, diabetes will be assessed in terms of its limitations on major life activities when the diabetic does *not* take insulin injections or medicine and does not require behavioral adaptations such as a strict diet."   *Rohr v. Salt River Project Agric. Improvement and Power Dist.*, 555 F.3d 850, 861–62 (9th Cir. 2009) (citing H.R. Rep. No. 110-730, at 8) (underlined emphasis added).   Courts have also recognized that Congress' insertion of the terms "when active," 42 U.S.C. § 12102(4)(D), brings temporary or episodic medical conditions within the potential purview of the ADA.   *Caldwell v. United Parcel Serv., Inc.*, No. 7:15cv358, 2016 WL 1736388, at *5 (W.D. Va. May 2, 2016).

CWF argues that J.D.'s impairment and symptoms do not substantially limit him in a major life activity as a matter of law, and he thus does not have a disability within the meaning of the ADA. ECF No. 23 at 15–19. Few cases have considered whether celiac disease or non-celiac gluten sensitivity can be considered disabilities under the ADA. CWF directs the Court to *Phillips v. P.F. Chang's China Bistro, Inc.*, No. 5:15cv344, 2015 WL 4694049 (N.D. Cal. Aug. 6, 2015) ("*Phillips I*"), as holding that celiac disease is not a disability. In *Phillips I*, the court noted that it "found no case directly dealing with the question of whether having celiac disease qualifies as a disability" under the ADA. *Phillips I*, 2015 WL 4694049, at *4. Citing to cases dealing with nut allergies, the court concluded that the plaintiff did not show how her celiac

disease substantially impacted a major life activity, because she could avoid symptoms by avoiding gluten. *Id.* Nevertheless, the court gave the plaintiff an opportunity to amend her complaint to possibly avoid dismissal of her claims. *Id.* at \*9.

The plaintiff did so, and P.F. Chang's once again filed a motion to dismiss, resulting in a second opinion in *Phillips v. P.F. Chang's China Bistro, Inc.*, No. 5:15cv344, 2015 WL 7429497 (N.D. Cal. Nov. 23, 2015) ("*Phillips II*"). The plaintiff in *Phillips II* amended her complaint to state that even items not made from wheat, barley, or rye could be cross-contaminated and cause her intestinal distress. *Id.* at \*3. She alleged that "[s]he could not simply eat some foods and avoid others but, absent a strictly gluten-free offering, she would have to avoid them all or risk dire consequences." *Id.* She also alleged that celiac disease is associated with an increased risk of cancer. *Id.* Given these new allegations, the court determined that the plaintiff successfully pled sufficient facts to support her claim that her celiac disease substantially impacted a major life activity, while noting that the court may reach a different conclusion on a more complete factual record.[17] *Id.* at \*4.

In another recent case, a plaintiff filed suit under the ADA claiming that the defendant chose not to hire him based on his celiac disease. *Kelly v. Kingston City Sch. Dist., Inc.*, No. 1:16cv764, 2017 WL 976943, at \*1 (N.D.N.Y. March 13, 2017). The court granted the defendant's motion to dismiss, stating that the plaintiff's celiac disease was not a disability because it was "well managed" by a gluten-free diet and that the plaintiff failed to plead facts showing he was substantially limited in the major life activity of eating. *Id.* at \*3–4. Similarly, in *Nolan v. Vilsack*, the court awarded summary judgment to the defendant, where the plaintiff

---

[17] The court never got the opportunity to consider a more detailed factual record. The plaintiff later voluntarily dismissed her claims. *Phillips v. P.F. Chang's China Bistro, Inc.*, No. 15cv344, 2016 WL 3136925 (N.D. Cal. June 6, 2016).

"admitted in his deposition that neither his celiac disease nor his dyslexia significantly affect[ed] his work as a firefighter or his day-to-day living," and thus did not establish that he suffered from a disability. No. 14-08113, 2016 WL 3678992, at *5 (C.D. Cal. June 30, 2016).

On the other end of the spectrum, some cases have determined that celiac disease could qualify as a disability under the ADA. *See Peterson v. Kelly Servs., Inc.*, No. 2:15cv74, 2016 WL 5858688, at *6 (E.D. Wash. Oct. 5, 2016), *appeal docketed*, No. 16-35967 (9th Cir. Nov. 22, 2016) (holding that a genuine issue of material fact existed as to whether the plaintiff was disabled as a result of her celiac disease); *Richards v. Dayton*, No. 13-3029, 2015 WL 1522199, at *39 (D. Minn. Jan. 30, 2015) (inmate pled facts sufficient to show he was a person with a disability by alleging that he had celiac disease).

Courts that have held that celiac disease is not a disability have largely done so by reliance on pre-ADAAA cases holding that a plaintiff's food allergy or diabetes does not constitute a disability under the ADA.[18] *See, e.g.*, *Kelly*, 2017 WL 976943, at *4 (citing *Land v. Baptist Med. Ctr.*, 164 F.3d 423, 425 (8th Cir. 1999)). The Eighth Circuit's *Land* decision is the seminal case determining whether a food allergy can qualify as a disability under the ADA.[19] In *Land*, the plaintiff, whose daughter suffered from a peanut allergy, brought suit, claiming that her daughter's day care violated the ADA by refusing to continue providing services to her daughter after she suffered two allergic reactions at the day care. *Id.* at 424. The Eighth Circuit held that she was not disabled under the ADA, because she was not restricted in any major life activity when she avoided peanuts. *Id.* at 425.

---

[18] Celiac disease and NCGS are not allergies, but are instead autoimmune disorders. Guerrerio Aff. ¶¶ 11–12. Nonetheless, allergy cases provide a helpful analogy to the problems a person with celiac disease or NCGS may experience in his or her major life activities.

[19] *Phillips I* and *Kelly* both relied on *Land* when granting motions to dismiss. *Phillips I*, 2015 WL 4694049, at *4; *Kelly*, 2017 WL 976943, at *4.

Another commonly cited pre-ADAAA case is *Fraser v. Goodale*, in which the Ninth Circuit held that a diabetic employee was disabled when she was required to "monitor carefully her day's diet, activities, and other similar factors," because, "[i]f she fails, she will find herself in a life-threatening situation." 342 F.3d 1032, 1035 (9th Cir. 2003). The court went on to state:

> Though we hold that eating is a major life activity, we do not thereby invite all those on a diet to bring claims of disability. Not every impediment to the copious and tasty diets our waistlines and hearts cannot endure is a substantial limitation of the major life activity of eating. We must carefully separate those who have simple dietary restrictions from those who are truly disabled. At the same time, we must permit those who are disabled because of severe dietary restrictions to enjoy the protections of the ADA.

*Id.* at 1041.

CWF also cites to the Middle District of Pennsylvania's decision in *Slade v. Hershey Co.*, which granted summary judgment to the defendant after deciding the plaintiff's peanut allergy was not a disability. No. 1:09cv541, 2011 WL 3159164, at *4–5 (M.D. Pa. July 26, 2011). The *Slade* court stated that "[t]hough a permanent, chronic, and severe allergy may constitute a disability, courts repeatedly find no disability where plaintiff suffers an avoidable allergic reaction." *Id.* at *4 (citing *Land*, 164 F.3d at 423). However, the events at issue in *Slade* occurred prior to January 1, 2009, the effective date of the ADAAA, and the *Slade* court accordingly applied pre-ADAAA law. *Id.* at *1, n.5. This is further underlined by *Slade's* citation to and reliance on reasoning from *Sutton*, which was expressly rejected by the ADAAA. *Id.* at *4–5; 122 Stat. 3553, § 2(b)(3).

J.D. argues that *Land* is no longer good law, because the ADAAA modified the definition of disability to clarify that an impairment qualifies as a disability when it "substantially limits a major life activity *when active*," 42 U.S.C. § 12102(4)(D) (emphasis added). ECF No. 27 at 19–20. J.D. further argues that the cases discussed above are of little persuasive value, because they

either applied pre-ADAAA law or blindly relied on pre-ADAAA cases. *Id.* Importantly, none of the cases cited above discussed what impact, if any, the ADAAA had on the *Land* decision. The closest example among cases cited by CWF is *Hustvet v. Allina Health Sys.*, where the District of Minnesota stated in a footnote, without further elaboration, that while *Land* and similar cases applied pre-ADAAA standards, the court still considered them persuasive. No. 16cv551, 2017 WL 3610524, at *3 n.3 (D. Minn. Aug. 22, 2017), *appeal docketed*, No. 17-2963 (8th Cir. Sept. 8, 2017).

By contrast, a number of courts have considered the impact of the ADAAA on the reasoning in *Land* and similar cases, and found that the ADAAA had undermined the reasoning of such cases. The Eastern District of Missouri found *Land* to be "of limited assistance" due to the ADAAA's favoring of a broad definition of disability. *Mills v. St. Louis Cty. Gov't*, No. 4:17cv257, 2017 WL 3128916, at *5–6 (E.D. Mo. July 24, 2017). In *Lopez-Cruz v. Instituto de Gastroenterologia de P.R., S.R.L.*, the court, while not explicitly reaching the issue, cast doubt on the continuing applicability of *Land* and similar cases in light of the ADAAA's rules regarding the impact of mitigating measures. 960 F. Supp. 2d 367, 371 n.8 (D.P.R. 2013).

CWF's reliance on cases determining that celiac disease is not a disability primarily by reference to *Land*, is problematic because it fails to address whether *Land's* reasoning survived the ADAAA. ECF No. 23 at 16–19. *Phillips I*, 2015 WL 4694049, at *4; *Kelly*, 2017 WL 976943, at *4. The Court agrees with plaintiff that, at the very least, the ADAAA has undermined the relevance of *Land* and like cases, which, in turn, undermines the reasoning in *Phillips I, Kelly,* and *Vilsack. Cf. Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 570, 572 (4th Cir. 2015) (holding, in a Title I context, that the district court erred in concluding on summary judgment that the plaintiff was not disabled, and that the ADAAA "abrogated

earlier inconsistent caselaw"); *Summers*, 740 F.3d at 330 (holding, in a Title I context, that the district court erred in determining the plaintiff did not suffer a disability, in light of the ADAAA's expanded definition of disability). As the Ninth Circuit recognized in *Rohr*, the need to maintain a strict diet could be considered a "behavioral modification" under the ADAAA's definition of mitigating measures, which is something that the ADAAA forbids courts from considering when assessing whether an individual has a disability. *Rohr*, 555 F.3d at 861–62. Eating is a major life activity, 42 U.S.C. § 12102(2)(A), and if a plaintiff has to substantially alter his diet in order to avoid serious health consequences, he may be substantially limited in the major life activity of eating. *See also Kravtsov v. Town of Greenburgh*, No. 10cv3142, 2012 WL 2719663, at *11 (S.D.N.Y. July 9, 2012) ("[I]n Plaintiff's case, planning meals is a mitigating measure the ameliorative effects of which cannot be considered in determining whether his impairment substantially limits major life activities."). If a plaintiff experiences disabling symptoms when he suffers an allergic, or gluten-caused, reaction, he can be considered disabled under the ADAAA, even if such symptoms are episodic.

The task currently before the Court is a fact-intensive inquiry about the nature and limitations resulting from J.D.'s impairments. *See Rohr*, 555 F.3d at 858 ("Whether Rohr's diabetes substantially limits his eating is an 'individualized inquiry.'") (citing *Fraser*, 342 F.3d at 1039). There is substantial disagreement between the parties about the limiting effects of J.D.'s impairments. Noting that Congress has cautioned that "the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations," and that "the question of whether an individual's impairment is a disability . . . should not demand extensive analysis," 122 Stat. 3553, § 2(b)(5), the Court concludes a genuine dispute of material fact exists as to whether J.D. suffers from a disability under the ADA.

19

First, the record is unclear as to whether J.D. suffers from celiac disease, with its attendant consequences, or the less-severe NCGS. The record is also unclear regarding which of J.D.'s symptoms, ████████████████████████ are actually caused or exacerbated by the ingestion of gluten. Reading the facts in the light most favorable to the plaintiff, if J.D. has celiac disease, and all of the symptoms enumerated by Dr. Guerrerio and J.D's parents are caused by ingesting gluten, then he would qualify as a person with a disability under the broad standards of the ADAAA. In light of the record presently before the Court, if this matter were to go forward, it would remain for a jury to assess factual issues pertaining to the nature and extent of J.D.'s condition and symptoms and any effect upon his activities.

Second, CWF's reliance on *Phillips I* is undermined, not only by the ADAAA, but by that court's decision in *Phillips II*. While *Phillips I* determined that the plaintiff could simply avoid gluten, *Phillips II* recognized that such a task may pose some difficulty, and acknowledged the plaintiff's serious symptoms. CWF asserts that J.D. does not suffer from the severe conditions alleged by the plaintiff in *Phillips II*, which the court held were sufficient to state a claim under the ADA. ECF No. 23 at 18. For example, the plaintiff in *Phillips II* alleged that her celiac disease was associated with an increased risk of developing cancer. *Phillips II*, 2015 WL 7429497, at *3. Although CWF downplays the record evidence of J.D.'s impairment, Dr. Guerrerio's affidavit explains that celiac disease comes with a higher risk of diseases such as cancer, and that, ████████████████████████████ J.D. may have celiac disease. Guerrerio Aff. ¶¶ 11, 15; ECF No. 28-2 at 6 (stating that "[d]iagnosis is celiac versus non-celiac gluten-sensitivity"). Also, medical records and deposition testimony indicate that J.D. ██████████████████████████████████
██████████████████████████████ K. Doherty Aff. ¶ 4; B. Doherty Dep.

31:4–31:24, 33:20–34:13, 47:4–47:21; ECF No. 23-5.  Plaintiff also credits gluten with causing ███████████████████████ an assertion supported by Dr. Guerrerio.  Guerrerio Aff. ¶ 13.

Third, Dr. Guerrerio, a pediatric gastroenterologist at Johns Hopkins Hospital, advised that it is medically necessary for J.D. to practice a strict gluten-free diet.  Guerrerio Aff. ¶ 18. The evidence, which a jury may choose to credit or not credit, is that J.D. and his parents must remain vigilant, because the ingestion of a small amount of gluten may have serious consequences for J.D.'s health.  K. Doherty Aff. ¶ 7.  That J.D. can avoid symptoms by exercising such vigilance is the type of mitigating measure that Congress has directed courts to disregard when determining whether an individual is disabled.[20]

Ultimately, CWF's summary judgment brief, in arguing that J.D. is not disabled, addresses some mild symptoms, such as ███████████████████ but glosses over the other, more serious symptoms advanced by J.D., which find some support in the record.  CWF is also not aided by ████████████████████████████ because Dr. Guerrerio's affidavit indicates this is common with celiac disease or NCGS.  Guerrerio Aff. ¶¶ 11–12.  For all these reasons, the Court concludes that there is a genuine dispute of material fact as to whether J.D.'s symptoms substantially limit him in a major life activity, such as eating, and such that he is a person with a disability under the ADA.[21]

---

[20] CWF's argument in its reply brief that mitigating measures are restricted to medication or other lessening measures, ECF No. 31 at 10–11, is unavailing, in light of the statute's use of "behavioral modification" as a potential mitigating measure.  As noted, other courts have considered this language to include structuring one's diet to avoid offending foods.  *See Kravtsov*, 2012 WL 2719663, at *11.

[21] 

ECF No. 33.

**B.      J.D.'s requested modification was not necessary for him to enjoy the goods and services Shields Tavern had to offer, because Shields Tavern offered him an experience like that offered to nondisabled patrons.**

The Court now turns to the question of whether CWF improperly discriminated against J.D. in violation of the ADA.  For purposes of this discussion, the Court will assume that J.D. was disabled within the meaning of the ADA.  When assessing whether a place of public accommodation complied with its ADA obligations, a court must consider whether the plaintiff was denied, on account of his disability, "the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations" of the place of public accommodation. *See* 42 U.S.C. § 12182(a).

As previously stated, discrimination can take the form of a failure to make modifications to a policy or practice in order to accommodate a disabled individual.  42 U.S.C. § 12182(b)(2)(A)(ii).  The Supreme Court has identified three pertinent inquiries.  They are: (1) "whether the requested modification is 'reasonable'"; (2) "whether it is 'necessary' for the disabled individual"; and (3) "whether it would 'fundamentally alter the nature of'" the place of public accommodation.  *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 683 n.38 (2001).  Whether reasonableness, necessity, or fundamental alteration should be decided first varies from case to case, and each must be resolved in the plaintiff's favor to merit relief.  *Id.* at 684 n.38; *Alumni Cruises, LLC v. Carnival Corp.*, 987 F. Supp. 2d 1290, 1304 (S.D. Fla. 2013) ("Obviously, if the requested modifications were not necessary, for this reason alone, [the plaintiff] would not be entitled to relief on its [Title III] claims.").

"[A]n accommodation might be reasonable but not necessary." *Id.* at 682.  If plaintiff's proposed modification is not necessary to accommodate his disability, he may not recover. *Dudley v. Hannaford Bros.*, Co., 333 F.3d 299, 311 (1st Cir. 2003); *see also* 42 U.S.C.

§ 12182(2)(A)(ii) (defining discrimination as "a failure to make reasonable modifications . . . when such modifications are <u>necessary</u> to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities") (emphasis added); *see also Goldman v. Brooklyn Ctr. For Psychotherapy, Inc.*, No. 15cv2572, 2018 WL 1385888, at *8 (E.D.N.Y. Mar. 19, 2018) (stating, in analyzing claims under Title III and the Rehabilitation Act, that a reasonable juror could find that the plaintiff's requested sign language interpreter was not necessary); *Bates v. Delmar Gardens N., Inc.*, No. 4:15cv783, 2018 WL 1251828, at *3 (E.D. Mo. Mar. 12, 2018) (denying plaintiff's renewed motion for judgment as a matter of law on claims under Title III and the Rehabilitation Act because the jury could reasonably conclude that the plaintiff's requested auxiliary aids were not necessary). The plaintiff bears the burden of showing that a particular modification was necessary. *J.T.I. and K.J.I. v. Walt Disney Parks and Resorts U.S., Inc.*, No. 6:14cv1931-Orl-22GJK, 2016 WL 10520121, at *4 (M.D. Fla. Sept. 26, 2016).

In assessing whether a modification is necessary, courts have looked to the "full and equal enjoyment" language of 42 U.S.C. § 12182(a). *Argenyi v. Creighton Univ.*, 703 F.3d 441, 450–51 (8th Cir. 2013) (public accommodations must provide reasonable "services so that all individuals have an equal opportunity to gain 'a like' or 'equal' benefit"); *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1135 (9th Cir. 2012) (public accommodations must take "reasonable steps to provide disabled guests with a like [but not necessarily identical] experience" as that of nondisabled guests); *Feldman v. Pro Football, Inc.*, 419 F. App'x 381, 391 (4th Cir. 2011) (holding that auxiliary aids which provided the content of emergency information, advertisements, and public service announcements to the hearing impaired were "necessary to the full and equal enjoyment of" a football game). A disabled individual is not

23

entitled to his or her specifically requested modification, but may be offered a reasonable alternative. *Callum*, 137 F. Supp. 3d at 840 (citing *McElwee v. Cnty. of Orange*, 700 F.3d 635, 641 (2d Cir. 2012)).

In this case, CWF has a "no-outside food policy," subject to certain minor exceptions. This is combined with a practice of offering gluten-free meals to those who request them. Deposition of Elizabeth Hatzidakis 32:13–32:23[22] (also noting that gluten-free options are on the standard menu). J.D. requested that CWF modify its "no-outside food" policy and claims CWF discriminated against him by refusing his request to eat gluten-free food prepared elsewhere inside of Shields Tavern.[23] The Court will first analyze whether that modification was necessary in order for J.D. to enjoy a like experience as that of Shields Tavern's nondisabled guests. If J.D. could fully enjoy the goods and services without a modification to the policy, then CWF complied with its ADA obligations and the inquiry ends there. *See Logan v. Am. Contract Bridge League*, 173 F. App'x 113, 117 (3d Cir. 2006) (holding that a vision-impaired bridge player was not entitled to use a special deck of cards because alternate accommodations were available that could fully account for plaintiff's disability); *Murphy v. Bridger Bowl*, 150 F. App'x 661, 663 (9th Cir. 2005) (holding that allowing a companion on a ski bike to accompany an individual with a cognitive disability was not necessary because there were alternative methods available which would fully accommodate the plaintiff's disability); *Coleman v. Phoenix Art Museum*, No. cv08-1833-PHX-JAT, 2009 WL 1097540, at *3 (D. Az. Apr. 22, 2009), *aff'd*, 372 F. App'x 793 (9th Cir. 2010) (holding that the plaintiff failed to meet his burden of showing that his own hip chair device was necessary to accommodate his disability

---

[22] The relevant excerpt of Elizabeth Hatzidakis' deposition is at ECF No. 20-21.

[23] As previously stated, J.D.'s family gave CWF no advance notice that they would be bringing their own food, but simply unpacked and attempted to eat it in the restaurant. B. Doherty Dep. 132:7–132:17.

when the museum offered two different kinds of wheelchairs that the plaintiff could have used); *cf. Lewis v. Zilog, Inc.*, 908 F. Supp. 931, 947 (N.D. Ga. 1995) (noting, in the employment context, that "[t]he term 'reasonable,' as it is employed in the ADA, would have no meaning if employers were required to provide employees the maximum accommodation or every conceivable accommodation possible") (citing 29 C.F.R. Pt. 1630).

J.D. argues that his proposed modification was necessary, because Shields Tavern could not have safely prepared him a gluten-free meal. ECF No. 27 at 24–27. J.D. argues that chef Zurowski lacked the appropriate training and expertise, and Shields Tavern did not employ the best practices, to mitigate the risk that the meal would become cross-contaminated with gluten. *Id.* J.D.'s primary evidence for his contention comes through the expert report and deposition testimony of Julie Rasmussen[24] ("Rasmussen"). Rasmussen opines that CWF's training regimen and staff knowledge were inadequate and it failed to follow industry-best practices for avoiding cross-contamination. CWF disputes these claims, arguing that Zurowski was qualified to prepare a gluten-free meal without cross-contamination, and that such a meal was not necessary in any case, if all J.D. wanted "was the entertainment and education of the tavern experience." ECF No. 31 at 11–14. The Court concludes that J.D.'s proposed modification was not necessary in order for him to enjoy a similar experience as that of his nondisabled peers, in light of CWF's offer to prepare a gluten-free meal, and that plaintiff's attempted challenge to the knowledge and credentials of the chef and the protocols of the restaurant fails to create a genuine dispute of fact on this issue. This is so because plaintiff's proffered facts are not material as to Zurowski's ability to prepare the specific meal offered to J.D. and his father.

---

[24] On February 14, 2018, CWF filed a motion to exclude Rasmussen's expert testimony from trial and to preclude admission of her written report as hearsay at trial, with an accompanying memorandum. ECF Nos. 35–36. That motion did not ask to strike such evidence from being considered for the purposes of this summary judgment motion.

Rasmussen criticizes Zurowski's knowledge, or lack thereof, of the organizations that perform gluten-free certification and about how gluten-free products and ingredients are labeled and certified. ECF No. 46-4 at 11–12. By virtue thereof, plaintiff suggests that Zurowski might have used gluten-containing ingredients he believed to be gluten-free based on an erroneous understanding of the labeling of such ingredients. Such a concern, however, is not material in this case, given the simple meal Zurowski offered to prepare for J.D. and his father, which consisted of baked chicken and fingerling potatoes.[25]  Indeed, Rasmussen testified in her deposition that chicken and potatoes do not contain gluten. Rasmussen Dep. 102:14–103:2. Accordingly, whether Zurowski could, for example, name the "Gluten Free Certification Organization," or even knew that any like organizations existed, is immaterial to whether he could have safely prepared the meal offered.

When discussing the procedures for preparing a gluten-free meal, Florimonte, CWF's director of food and beverages, stated that the taverns in Colonial Williamsburg use a separate, designated area that has been sanitized to make sure that it has no contact with flour. Florimonte Dep. 42:19–42:25. Zurowski testified that he washes and sanitizes the area completely before preparing a gluten-free meal. Zurowski Dep. 40:6–40:19. Rasmussen stated that she was concerned by this testimony, Rasmussen Dep. 90:2–90:15, because gluten cannot be "'killed' or

---

[25] In its reply brief, CWF notes that Zurowski "prepared baked chicken, baked fries and steamed vegetables." ECF No. 31 at 6. At Rasmussen's deposition, CWF's attorney Dana L. Rust, Esq., stated that Zurowski would prepare chicken, potatoes, and vegetables that night and posed questions to Rasmussen about those foods. Rasmussen Dep. 102:14–102:19. However, in the excerpts provided to the Court, neither Brian Doherty nor chef Zurowski mentions that Zurowski had prepared or offered to prepare vegetables for J.D. and his father. The Court will therefore consider the meal as consisting of baked chicken and fingerling potatoes, as testified to by J.D.'s father. In any case, Rasmussen testified that vegetables would ordinarily be gluten-free provided they did not come from a can containing a sauce. Rasmussen Dep. 102:24–103:2. There is no evidence that Zurowski would have used canned vegetables in preparing the meal for J.D. and his father.

'sanitized' away." ECF No. 46-4 at 8. However, she admits in her deposition testimony that a chef should sanitize and clean the area before preparing a gluten-free meal, that gluten is a physical object that can be washed away, and that mixed-use areas (areas where both gluten-containing and gluten-free meals are prepared) are acceptable, as long as appropriate protocols, such as thoroughly cleaning the area, are in place to avoid cross-contact. Rasmussen Dep. 91:16–92:18.

Rasmussen further criticizes Zurowski and Florimonte for not being able to accurately outline all of the ingredients which could contain gluten, such as rye. ECF No. 46-4 at 11. Again, this criticism is not material, because Rasmussen acknowledged that the meal offered to J.D. and his father (baked chicken and fingerling potatoes) ordinarily would not contain wheat, barley, rye, triticale, or any other ingredient that contains gluten. Rasmussen Dep. 102:14–103:2. Rasmussen criticizes Florimonte in her report for not recognizing that malt vinegar contains gluten. ECF No. 46-4 at 11. However, Zurowski, the chef who actually offered to prepare the meals, stated in his deposition that malt vinegar contains gluten. Zurowski Dep. 43:11–43:18. Nor is there any evidence in the record that Zurowski intended to prepare the meals using malt vinegar.

Rasmussen criticizes Shields Tavern for placing salads with ranch dressing, which contains gluten, at each table where J.D. and his fellow diners were to be seated on May 11, 2017, prior to the diners taking their seats. ECF No. 46-4 at 9. Multiple CWF employees testified, however, that seating was open and that Shields Tavern was not informed where the gluten-free diners would be seated. Zurowski Dep. 51:3–52:9; Deposition of Anne Chalkley

27

36:5–36:17.[26]  Once they identified themselves, they would have been provided with a gluten-free salad.  Zurowski Dep. 51:3–52:9.  While Rasmussen may disagree with Shields Tavern's policy of placing the salads and then providing a gluten-free salad later, once the appropriate parties identified themselves, such a policy is not indicative of a lack of competence on Zurowski's part to safely prepare a gluten-free meal.

Sorting through these immaterial facts, the Court is left to examine whether Shields Tavern could have prepared this meal, rendering J.D.'s requested modification unnecessary. Here, the Court turns to Zurowski's deposition about his procedures for preparing a gluten-free meal.  Based on Zurowski's testimony, he prepared the fried chicken meals that night on one end of the counter for the other members of J.D.'s group, and then would have[27] washed and sanitized the counter completely before preparing meals for J.D. and his father at the other end of the counter, roughly thirteen feet away.[28]  Zurowski Dep. 37:8–37:15, 40:16–40:24; Rasmussen Dep. 97:9–97:20.  He testified that his practice was to wash his cooking utensils and containers prior to preparing any gluten-free meals.[29]  Zurowski Dep. 91:3–91:8.  He would have changed his apron and gloves.[30]  Zurowski Dep. 93:4–93:7.  As for the potatoes, Zurowski stated that he

---

[26] Excerpts of Anne Chalkley's deposition are located at ECF No. 27-18.  She was the manager at Shields Tavern on May 11, 2017.

[27] As noted, based on J.D.'s father's deposition testimony, the Court accepts as true the assertion that Zurowski had not yet prepared any gluten-free meals.  B. Doherty Dep. 161:7–161:16.

[28] Rasmussen acknowledges that it is "not realistic" for every restaurant to have a separate space dedicated to only gluten-free meals, and that mixed-use environments can be acceptable if the proper protocols are followed.  Rasmussen Dep. 91:7–91:12, 93:22–94:14.

[29] While Rasmussen criticizes Shields Tavern for not having dedicated pots and pans used solely for preparing gluten-free meals, ECF No. 46-4 at 13, she admits in her deposition that mixed-use pots and pans can also be acceptable, if cleaned thoroughly.  Rasmussen Dep. 91:16–93:8.

[30] Rasmussen agreed that changing the apron and the gloves would also be proper protocol. Rasmussen Dep. 101:22–102:2.

planned to bake them, and knew not to fry them in the same oil where he had previously fried the chicken.[31] Zurowski Dep. 44:17–45:20. He testified that he sometimes uses the same oven to prepare gluten-free food and food with gluten, but that he probably would have used separate ovens on that day.[32] Zurowski Dep. 91:17–91:22.

With respect to how the meal was to be transported from the kitchen to the table, Dana Eason, one of the servers that night, testified that the gluten-free meal would have been labeled so that serving staff could identify it as such, and that it would have been covered with a metal lid to prevent it from coming into contact with other food. Eason Dep. 18:2–18:13. The server would not have removed the lid until the meal reached the table. Eason Dep. 18:18–18:23. This corresponds roughly with what Rasmussen testified were best practices with regard to protecting the meal from cross-contamination, after it was prepared. Rasmussen Dep. 119:16–120:9.

Ultimately, Zurowski's experience indicates that cross-contamination is uncommon, as he testified to typically preparing four to five gluten-free meals per day at Shields Tavern and estimated that he prepared over 5,000 gluten-free meals over the preceding five years, all without ever receiving a single complaint that the meal actually contained gluten. Declaration of Anthony Zurowski ¶¶ 4–5, ECF No. 20-22 ("Zurowski Decl."). While the lack of complaints certainly does not mean that a mistake has never occurred, as Rasmussen argues, Rasmussen

---

[31] While Rasmussen criticizes Zurowski for not being sure that reused oil would be cross-contaminated with gluten, Zurowski was clear that, as a precaution, he would not reuse oil previously used for a gluten-containing meal when preparing a gluten-free meal. Zurowski Dep. 44:17–45:20. Florimonte testified that "[n]o gluten-free meals are prepared using a fryer because they're all baked or boiled." Florimonte Dep. 49:19–49:21. Thus, whether Zurowski knew that oil would not "kill" gluten is not material, in light of his standard practice. Rasmussen agreed that oil would not be involved in making the offered meal. Rasmussen Dep. 100:22–101:3.

[32] With respect to ovens, Rasmussen testified that cross-contact can occur if the walls of the oven have residual gluten on them and food touches them, but that "[t]he oven isn't as big of a problem usually," due to food being placed in a pan while in the oven. Rasmussen Dep. 117:14–118:16.

Dep. 113:12–114:15, Zurowski's declaration is still the only evidence before the Court regarding Shields Tavern's record for preparing meals for customers who request gluten-free food.

In her report, Rasmussen opines that "[e]ven with industry[-]best practices implemented . . . mistakes can still be made, misunderstandings can occur, and customers can be made sick. . . . It is a calculated risk for anyone with . . . celiac or gluten sensitivity to ever eat out at a restaurant where gluten . . . is present." ECF No. 46-4 at 10–11. In so opining, Rasmussen acknowledges what experience teaches, namely, that there is often some level of risk associated with most human endeavors. For example, a person with or without celiac disease who eats at a restaurant, exposes themselves to the risk that a meal might contain harmful pathogens. Having some apparent knowledge of the risks described by Rasmussen, J.D. and his father not only decided in advance to bring their own food, plates, and eating utensils to Shields Tavern, but also rejected the Tavern's offer to prepare a meal without inquiring or investigating the protocols employed by the Tavern to mitigate the risk of gluten contamination.

Although they were free to refuse the Tavern's offer, this refusal does not render their own proposed modification necessary. *See Montalvo v. Radcliffe*, 167 F.3d 873, 879 (4th Cir. 1999) ("While an ADA plaintiff is under no obligation to accept a proffered, otherwise reasonable modification . . . such rejection does not impose liability . . . for failure to modify"). At best, the plaintiff has demonstrated that Shields Tavern did not take every possible precaution, such as, for example, not having a dedicated space for gluten-free cooking. But the law does not entitle a plaintiff to the "best practices" identified by plaintiff's expert, only a like experience as non-disabled guests. *See Walt Disney*, 2016 WL 10520121, at *4–5; *Logan*, 173 F. App'x at 117; *Murphy*, 150 F. App'x at 663; *Coleman*, 2009 WL 1097540, at *3; *Lewis*, 908 F. Supp. at 947 (stating that a disabled individual is not entitled to the "maximum accommodation or every

conceivable accommodation possible"). In fact, as recounted above, Rasmussen testified about best practices, but acknowledged that alternative practices, such as using mixed-use areas, may still be acceptable.

Further, J.D. has presented no evidence regarding the actual risk of cross-contamination beyond mere speculation.[33] There is no evidence before the Court indicating that J.D., his father, or Rasmussen actually inspected Shields Tavern's kitchen, or made any detailed inquiries as to what ingredients would be used in the offered meal, or what ingredients were actually present in the area of the kitchen where Zurowski was to prepare the meals. No information was known to J.D. and his father about the chef's credentials or the Tavern's protocols when the father decided to bring his own food into the Tavern. There is no evidence that J.D. or his father had sought such information before rejecting the Tavern's offer of a meal.[34] In fact, J.D.'s father, who had never been to Shields Tavern before, admitted at his deposition that he had no specific reason not to trust the kitchen staff at Shields Tavern.[35] B. Doherty Dep. 116:22–116:25, 118:4–118:14.

---

[33] For example, while Rasmussen testified that flour could have traveled over to the prep area through the air due to the number of fried chicken meals prepared, she admitted that there was no evidence in the record that this actually occurred. Rasmussen Dep. 99:9–99:24. She further testified that you can see the flour, and so it can be cleaned by a vigilant chef. Rasmussen Dep. 94:20–95:13. Zurowski's testimony that he would have sanitized and washed the area, Zurowski Dep. 40:6–40:19, before preparing J.D.'s meal is consistent with such a procedure.

[34] This also undermines Rasmussen's argument that best practices dictate cooking the gluten-free meal before the gluten-containing meals. Rasmussen Dep. 119:16–119:20. J.D. argues that the gluten-free meals ordered by the school were not ordered for him and his father. If true, J.D.'s family gave the Tavern no indication that it would need to prepare a gluten-free meal for them, making it infeasible to expect Zurowski to prepare such a meal before the meals containing gluten. Had his family given the Tavern advance notice, perhaps Zurowski would have prepared such meals before the normal fried chicken meals.

[35] Brian Doherty did note the fried chicken meals at the time he refused Zurowski's offer, B. Doherty Dep. 161:16–161:22, but the record establishes that he had decided before then not to eat the food at Shields Tavern. There is no testimony before the Court that Doherty viewed the salads as a black mark on the restaurant's ability to prepare a gluten-free meal, but he did state regarding the salads that "I have no idea how clean the plate is or how the person who put the

31

Notwithstanding this, prior to setting foot in Shields Tavern, J.D.'s father decided not to eat the food there and to bring an outside meal for J.D. to eat, complete with his own plates and plastic ware. B. Doherty Dep. 158:17–159:14 (explaining how he told the server that he did not want her to bring out any food for him and J.D. because they were not going to eat it), 188:4–188:5 (explaining how he told the manager that J.D. "can't eat the food here").[36] The only evidence before the Court, however, of Shields Tavern's actual record of preparing meals for customers seeking gluten-free food is that it has consistently done so, prior to the encounter with J.D., without complaint.

Finally, J.D. has asserted that Shields Tavern is "not just a restaurant," and that guests receive a unique experience independent of the food. ECF No. 27 at 7, 25. The relevant question is whether Shields Tavern offered J.D. full and equal access to what it offered to nondisabled guests. To nondisabled guests, Shields Tavern offered food and atmosphere. Certainly, Shields Tavern did not deny J.D. its food; J.D. rejected any meals prepared by the restaurant. Essentially, J.D. argues that he was denied the atmosphere of an eighteenth-century colonial tavern. However, as previously stated, he and his father could have stayed in the Tavern and either eaten a meal prepared by the restaurant, as all other, nondisabled guests were doing, or could have remained inside the Tavern and postponed consumption of their self-supplied meal until a later time. Instead, they chose to eat their own food outside the Tavern. CWF did not deny J.D. a like experience as that of nondisabled guests.

---

salad on the plate, how well they washed their hands, how – whether the lettuce is kept in a hermetically sealed container." B. Doherty Dep. 157:20–157:24. Despite these concerns, he did not seek answers from the Tavern.

[36] There is even evidence that Brian Doherty told NAPS, but not CWF, months ahead of the trip that he had no intention of eating the Tavern's food. B. Doherty Dep. 126:9–126:25, 129:4–129:15, 131:2–131:7; Deposition of Devon Clouse 45:2–45:10.

For all these reasons, J.D. has not carried his burden to show that his requested modification was necessary in order to receive an experience like that accorded to Shields Tavern's nondisabled guests. The Court concludes that, based on the evidence in the record, a reasonable juror could not find that plaintiff's requested modification was necessary. Having concluded that CWF is entitled to summary judgment on this basis, the Court need not address whether J.D.'s proposed modification was reasonable or whether adopting it would have fundamentally altered CWF's business.[37] *See Alumni Cruises*, 987 F. Supp. 2d at 1304 ("Obviously, if the requested modifications were not necessary, for this reason alone, [the plaintiff] would not be entitled to relief on its [Title III] claims.").

## V.   RECOMMENDATION

For the foregoing reasons, the Court recommends that defendant CWF's motion for summary judgment, ECF No. 19, be GRANTED, with respect to counts one through three of the complaint.

## VI.   REVIEW PROCEDURE

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within 14 days from the date of mailing of this report to the objecting party, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail. A party may respond to any other party's

---

[37] On March 8, 2018, J.D. filed a motion for partial summary judgment and to strike CWF's affirmative defense of fundamental alteration, with an accompanying memorandum. ECF Nos. 54–55. In light of the recommended disposition described herein, the Court need not reach that issue.

objections within 14 days after being served with a copy thereof. *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2. A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

Robert J. Krask
United States Magistrate Judge

Robert J. Krask
United States Magistrate Judge

Norfolk, Virginia
March 27, 2018